**Mark H. ADAMS et al., Plaintiffs,**

**v.**

**UNITED STATES of America, Defendant.**

**No. W–4684.**

United States District Court, D. Kansas.

July 23, 1975.

Mark H. Adams, of Adams, Jones, Robinson & Malone, Wichita, Kan., for plaintiffs.

Irving Shaw, Asst. U. S. Atty., Robert J. Roth, U. S. Atty., Wichita, Kan., Douglas G. Anderson, Yale F. Goldberg, Robert S. *Milligan*, Trial Atty. Tax Div., Refund Trial Sec. No. 3, Dept. of Justice, Washington, D. C., for defendant.

DECISION OF THE COURT, TOGETHER WITH FINDINGS OF FACT AND CONCLUSIONS OF LAW

THEIS, District Judge.

INTRODUCTORY STATEMENT

This action arose as a suit for refund of federal estate taxes and interest in the stated amount, brought by the Executors of the Will of a substantially wealthy decedent against the Government. There is no dispute between the parties as to venue or jurisdiction of the Court, which is granted jurisdiction under 28 U.S.C. § 1341(a)(1). Trial was had to the Court and the matter submitted. The Court now makes Findings of Fact and Conclusions of Law, followed by "Decision of the Court," setting forth the reasoning and legal authorities applied by the Court in reaching a decision in this matter.

FINDINGS OF FACT

1. This is an action for the refund of federal estate taxes and interest in the amount of $901,088.85, plus interest thereon as provided by law, in which action there were three issues:

(a) Claimed marital deduction free of federal estate tax;

(b) The amount of administrative expense to which the estate is entitled as deduction against federal estate taxes;

(c) *What, if any, charitable deduction* from federal estate taxes is the estate entitled?

On August 31, 1973, judgment was entered for the plaintiffs on issue (a) above set forth. Presently the parties have filed herein stipulation and agreement for a judgment in favor of the plaintiffs on issue (b) fixing the amount of the deduction against federal estate tax for the estate in the sum of $368,564.62, and for judgment accordingly.

2. Tom Palmer died testate May 19, 1966, and his Will was admitted to probate in the proceedings in the Probate Court of Sedgwick County, Kansas; Mark H. Adams, Hugh S. Edgerton, Jeff C. Lyle and The Union National Bank of Wichita, Kansas, are the duly qualified and acting Executors under such Will and are the duly appointed, qualified, and acting trustees under the two separate and distinct trusts provided for under such Will, a true copy of which is attached to the Pre-Trial Order as Exhibit "A".

3. After certain bequests relating to testator's homestead, household furnishings, automobile and other such items to decedent's wife and certain bequests to certain of decedent's employees, Paragraph Seventh of decedent's Will bequeaths to each of decedent's grandchildren, Dianne Courtney Buller and John Thomas Courtney, the sum of $25,000.-00. Under Paragraph Eighth of decedent's Will, all the rest, residue, and remainder of said estate was given, devised and bequeathed unto Mark H. Adams, Hugh S. Edgerton, Jeff C. Lyle, and The Union National Bank of Wichita, Kansas, in trust, to have and to hold the same upon two separate and distinct trusts:

A. TRUST "A"

"1. To have and to hold an undivided one-half (½) of said residuary estate, said trust to be designated as Trust 'A'.

2. During the existence of said trust, said trustees shall pay all of the net income from said trust estate to my wife, Daisye Palmer, for and during the period of her natural life, in quarterly or monthly payments, as said trustees shall determine.

3. I specifically direct that my wife, Daisye Palmer, shall have the power, exercisable by her alone and in all events to appoint the entire corpus of said trust or any portion thereof, free of said trust. Said power of appointment may be exercised by her in favor of her estate, or such person or persons as she may direct, and it may be exercised by her by Will.

4. Upon the death of my wife and in event she has not exercised the foregoing power of appointment, I direct that the remaining corpus and undistributed income, if any, in said Trust 'A' shall be by the trustees thereof assigned, transferred and distributed to and merged with, and thereafter administered and distributed as a part and in accordance with the terms of Trust 'B' hereinafter referred to."

B. TRUST "B"

"1. To have and to hold an undivided one-half (½) of said residuary estate, said trust to be designated as Trust 'B'.

2. With respect to the net income from said trust, I direct:

(a) That during the lifetime of my daughter, Eileen Palmer Courtney (now Eileen Hipps), there shall be paid and distributed to her $600 a month.

(b) During the lifetime of my wife, Daisye Palmer, the remainder thereof shall be paid and distributed to her.

(c) Any remainder thereof shall be retained in said trust for reinvestment purposes and ultimate distribution as hereinafter provided.

3. I direct that my trustees shall pay to or expend for the use or benefit of my grandson, John Thomas Courtney, all necessary funds to pay any medical and hospital expenses by him incurred, and to provide for the care, comfort, maintenance, support and general welfare of my said grandson during his lifetime, and at the time of his death provide adequate funeral and burial services. While it is my desire that the trustees liberally provide for my grandson, said trustees shall, in their sole discretion, determine and conclude, from time to time, the extent and amount of care, support and maintenance expenditures from said trust estate.

4. Upon the deaths, respectively, of my wife, Daisye Palmer, my daughter, Eileen Palmer Courtney, and my grandson, John Thomas Courtney, I direct and authorize my trustees to contribute and make

distribution of the remainder of such trust estate:

(a) To Hugh S. Edgerton and to Jeff C. Lyle, in equal shares, Lots 41, 43, 45 and 47 on Lawrence Avenue, now Broadway Avenue, in Greiffenstein's Original Town, now City of Wichita, in Sedgwic County, Kansas, as shown by the recorded plat thereof;

(b) The remainder of said trust funds and property shall be paid and distributed to a charitable and educational corporate foundation, to be created by the trustees, to be known and designated as "The Ella Palmer Foundation". That in the formation of such corporate foundation, its trustees shall be empowered to make contributions from either or both the corpus and income of the foundation properties to other educational or charitable corporations in Wichita, Kansas, in each instance for the establishment of a memorial to my mother, Ella Palmer."

Said Will then proceeds under Paragraph Ninth thereof, to provide:

"The trustees of my said Trusts 'A' and 'B' shall have the following powers, rights, duties and obligations:

. . . . . . .

(d) I hereby authorize my said Trustees, irrespective of the provisions for the distribution of my said trust estates, to at any and all times pay from either the income or corpus of these trust estates to any of the beneficiaries hereinabove named or designated, such sum or sums of money as in the opinion and sole discretion of said Trustees shall be deemed necessary, advisable and requisite for their maintenance, support, care and health. Should any payment be made under this provision to any such person, the same shall be charged as an advancement to the share of such person in such trust estates, if such person's interest therein is that of an ultimate beneficiary."

Paragraph Fifteenth of decedent's Will then provides:

"I instruct and direct my executors to establish the trusts in this Will created at the earliest possible date, place therein immediately all assets of my estate, which are not otherwise devised or bequeathed or are necessary for the payment of debts, expenses or taxes which may be chargeable to, or assessed against, my said estate. I specifically authorize and direct the executors acting hereunder to make payments which my trustees may be authorized to make, as hereinbefore provided for, to the beneficiaries named or designated herein, at the time and in the manner hereinbefore set forth, and to continue to make said payments until my trustees shall qualify and receive the assets of the respective trusts created by this Will."

4. At the time of decedent's death, he left a gross estate of a value of approximately $4,290,000.00.

5. After the payment of all specific bequests and estimated state inheritance and federal estate taxes, there remains in said estate and as partially distributed to Trust Estates "A" and "B" property valued as of September 30, 1974, as follows (see Plaintiff's Exhibit 12):

(a) In decedent's estate, property of the approximate value of $175,000.00.

(b) Distributed to Daisye Palmer through Trust Estate "A", property of the approximate value of $975,000.00.

(c) In Trust Estate "B", property of the approximate value of $975,000.00.

The final distribution awaits a final determination of the federal estate taxes ($352,303.77 having been paid with return filed in 1967) and state inheri-

tance taxes due from said estate or by reason of the succession thereof, there having heretofore been paid Kansas succession and inheritance taxes in the sum of $66,224.24; that before the payment of the additional federal estate tax, and interest thereon, complained of, there was in the estate and the trust estates property of a total value of approximately $3,475,000.00, from which (on experience to date) there has accrued net income per annum of in excess of $100,000.00.

6. Under date of June 2, 1969, Articles of Incorporation of the Ella Palmer Foundation, Inc., were issued by the Secretary of State of Kansas, and the same was supplemented by amendment dated June 27, 1969, creating a corporation organized not for profit to comply with the instructions in decedent's Last Will and Testament, the purpose of such corporation being to transact and carry on charitable, scientific or educational purposes within the meaning of § 501(c)(3) of the United States Internal Revenue Code of 1954, as amended. U. S. Treasury Exemption Certificate was granted such Foundation on July 11, 1969.

7. At the time of decedent's death, the following persons were of the following ages, with the following life expectancies:

| Name | Age | | Life Expectancy |
|---|---|---|---|
| Daisye Palmer, wife | 66, | birthdate May 20, 1900 | 10.5 yrs. |
| Eileen Palmer Courtney, daughter | 43, | birthdate June 22, 1923 | 26 yrs. |
| John Thomas Courtney, grandson | 18, | birthdate October 14, 1948 | 43 yrs. |
| Hugh S. Edgerton, trustee | 50, | birthdate January 4, 1916 | 20.9 yrs. |
| Jeff C. Lyle, trustee | 43, | birthdate February 19, 1923 | 26 yrs. |

8. At the time of decedent's death the separate property of decedent's daughter, Eileen Hipps (nee Courtney), was of nominal value; that as a result of an adversary proceeding in decedent's estate in the Probate Court of Sedgwick County, Kansas, having jurisdiction of the official acts of fiduciaries, plaintiffs herein, order was entered therein on September 26, 1969, fixing and determining that for the care, support and maintenance of said Eileen Hipps, and furnished by the executors of the estate, the fair and reasonable costs of such care, support and maintenance was $1200.00 a month (including the $600.00 per month testamentary legacy); that such cost per month was comparable to that being incurred for the support and maintenance of the said Eileen Hipps in the same standard and fashion she lived on the date of decedent's death; that thereafter, and as a result of a further adversary proceeding in said Probate Court, order was entered therein on September 10, 1971, fixing and determining that for the care, support and maintenance of the said Eileen Hipps in the housing facility furnished by the estate, the fair and reasonable cost thereof was $1300.00 a month (including the $600.00 per month testamentary legacy).

9. Decedent's grandson, John Thomas Courtney, had at the time of decedent's death separate property of a value in excess of $100,000.00 producing an income to him of more than $5,000.00 per year. That in addition thereto, he received a $25,000.00 bequest under decedent's Will, which increased his capital estate in that amount. That during the years 1963, 1964, and 1965, respectively,

John Thomas Courtney lived with his grandparents, decedent Tom Palmer and his wife, and attended Kapaun Memorial High School in Wichita, Kansas. During the year 1964, John Thomas Courtney had an income from his sole property of $1,359.48, which he contributed towards his support. During that year, John Thomas Courtney's grandfather, Tom Palmer, claimed he provided 70% of the cost of support of John Thomas Courtney and was entitled to claim him as an exemption. IRS allowed such a claim. On this basis, the total cost of care, maintenance and education for said minor in 1964 was the sum of $4,531.60; that during the year 1965, John Thomas Courtney had from wages and earnings on his capital, $2,486.70, which he contributed to his support. For said year, decedent Tom Palmer claimed he provided 60% of the cost of support of John Thomas Courtney and was entitled to claim him as an exemption. IRS allowed such claim. On this basis, the total cost of the care, maintenance and education of John Thomas Courtney for the year 1965 was $6,215.00. At the date of decedent's death, John Thomas Courtney had suffered severe and permanent injuries as a result of an automobile-train collision, which left him at least 20% disabled (Defendant's Exhibit H). During the year 1966, in which decedent died, John Thomas Courtney had continued to live in the home of his grandparents, decedent and his wife, here in Wichita, up to the date of decedent's death, after which time he moved to Hutchinson, Kansas, where he lived with his sister, Dianne Buller, paying her for his board and room and paying for registration and entrance fees at Hutchinson Junior College, Hutchinson, Kansas; that the total costs incurred by the said John Thomas Courtney for his care, support, and education for the year 1966, was the sum of $6,000.00; that for each of the years 1967, 1968, 1969, 1970 and 1971, the costs for the support, maintenance, and education of John Thomas Courtney has averaged approximately $6,000.00 a year; in 1972 he was not employed; he did some work at Wichita State University, Wichita, Kansas; that from his wages and earnings from his investments, John Thomas Courtney has been able to support himself since his grandfather's death without the necessity of the payment of any money to him from the income from his grandfather's estate, except $1,000.00 of estate income paid to him in 1966.

10. At the time of decedent's death, the separate property of decedent's wife, Daisye Palmer, was of nominal value. That under the terms of decedent's Will there is by reason of the power of appointment given therein to the said Daisye Palmer available for her use, care, and maintenance, not only one-half of the property in the estate, but also any part of the unexpended income from the other one-half of the property in such estate, which latter one-half will, upon distribution, become the property of Trust "B". Actually, Daisye Palmer did exercise her power of appointment of the property in Trust "A", i. e., one-half of the residue, and distribution was made to her pursuant to a stipulation filed in the Probate Court of Sedgwick County, Kansas, on March 9, 1972. However, the actual exercise of the power post-death is not important to this decision, since the Court considered the power itself to be equivalent to instant distribution at date of decedent's death as a fact.

11. Plaintiffs duly filed in the office of the District Director of Internal Revenue, Wichita, Kansas, on the 15th day of August, 1967, Federal Estate Tax return Form No. 706, and duly paid all federal estate taxes in the sum of $352,303.77 due and payable thereunder in said estate, there being no interest thereon due at that time.

12. On or about July 24, 1970, defendant, by and through its District Director of Internal Revenue, issued its ninety-day letter advising plaintiffs of a deficiency in federal estate tax in said

decedent's estate in the amount of $741,982.40, based respectively upon the disallowance in whole or in part of the following deductions claimed per return:

(a) Administration expenses claimed in the total sum of $279,224.40—there was disallowed as a deduction the sum of $260,659.78 resulting in a deduction allowed of $18,564.62.

(b) Marital deduction claimed in the total sum of $1,924,694.73. There was disallowed as a deduction the sum of $547,354.66, resulting in a deduction allowed of the sum of $1,377,340.07.

(c) Charitable bequest deduction claimed in the total sum of $801,695.63. There was disallowed charitable bequest in decedent's estate to the Ella Palmer Foundation the entire amount of this claimed deduction.

As a result of such disallowances there was a proposed deficiency assessment of federal estate tax of $741,982.40, together with interest thereon to November 20, 1970, in the sum of $144,808.54.

13. In the aforementioned federal estate tax return there was claimed as a deduction administration expenses paid or estimated in the sum of $279,224.40. Subsequently, and on or about August 11, 1970, plaintiffs filed with the United States Treasury Department, Internal Revenue Service claim on Form 843 for additional administration expenses estimated in the sum of $250,000.00, resulting in a claim for refund of federal estate tax of $67,250.00.

14. On or about December 3, 1970, plaintiffs paid to said District Director of Internal Revenue the alleged deficiency of federal estate tax in the sum of $741,982.40, and the sum of $96,000.00 toward the satisfaction of the interest accrued on such alleged deficiency; that thereafter, and on January 15, 1971, plaintiffs paid to said District Director of Internal Revenue $48,808.54 remaining interest due on such federal estate tax deficiency.

15. On or about February 1, 1971, plaintiffs filed with the United States Treasury Department, Internal Revenue Service, their claim for refund on Form 843, of federal estate taxes in the amount of $756,279.51, together with interest paid thereon in the amount of $144,808.54, based respectively upon the following deductions claimed, as more specifically set forth in said Form 843 (Plaintiffs' Exhibit 7).

(a) Administration Expenses: Claimed in the total sum of $521,580.53, resulting in an additional claimed deduction of $503,015.91 in excess of the $18,564.62 previously allowed per the ninety-day letter. (This claim settled by stipulation of the parties.)

(b) Marital Deduction: Claimed in the total sum of $1,806,425.39, resulting in an additional claimed deduction of $429,085.32 in excess of the $1,377,340.07 previously allowed per the ninety-day letter. In the alternative, if the deduction for the administration expenses is decreased, there is hereby claimed the increased marital deduction. (This claim in judgment April 18, 1973.)

(c) Charitable Bequest Deduction: Claimed in the total sum of $705,809.74, resulting in an additional claimed deduction of $750,809.74, as no amount was allowed per the ninety-day letter. In the alternative, if either or both of the deductions for the marital deduction or administration expenses are decreased, there is claimed increased charitable bequest deduction.

16. Everything in Testamentary Trust "B", except the city real estate, will ultimately go to the charitable trust, The Ella Palmer Foundation. Such property or fund already amounts to over $800,000.00, in addition to which there will also accrue to such fund:

(a) The net income from the rental from the real estate in Trust "B"

during the lifetimes of Mrs. Palmer, Eileen Hipps, and John Thomas Courtney;

(b) One-half of the approximate $150,000.00 remaining property in the estate at this time; and also

(c) One-half of the recovery in this tax refund suit.

17. During all the years in which accounting procedure has been completed (to December 31, 1973) since the date of decedent's death on May 19, 1966, payments from the estate to decedent's wife, Daisye Palmer, decedent's daughter, Eileen Hipps, and decedent's grandson, John Thomas Courtney, for their care, support, and maintenance, have as a total been less than the total income from the property in said estate. While under the law of the case the facts are determinable as of the date of death of the decedent and actually post-dated facts must be ignored in finding the facts and applying the law to such facts.

## CONCLUSIONS OF LAW

1. Under the Last Will and Testament of the decedent, Tom Palmer, the Trustees are authorized to invade the corpus of Trust "B" for the benefit of non-charitable beneficiaries, including Daisye Palmer, Eileen Palmer Courtney Hipps, John Thomas Courtney, Hugh Edgerton and Jeff Lyle.

2. The Will of the decedent provides an ascertainable standard for calculation of reasonable amounts due from the assets of the estate as may be needed for the care, support and maintenance of the following beneficiaries:

Daisye Palmer, widow
Hugh Edgerton, devisee
Jeff Lyle, devisee
Eileen Palmer Courtney Hipps, daughter
John Thomas Courtney, grandson

in the same fashion and standard as they respectively lived on the date of decedent's death.

3. There is no reasonable likelihood that the decedent's widow, Daisye Palmer, would either need or require any payment from the corpus of the property constituting the assets of Trust "B" in view of wealth accruing to her from the property in Trust "A" and its sizeable income producing potential.

4. As to decedent's daughter, Eileen Palmer Courtney Hipps, viewing the situation at date of testator's death, there exists a probability of invasion of the corpus of Trust "B" during her life expectancy of a yearly amount based on her customary standard-of-living less the amount of specific legacy of $600.00 per month in Paragraph EIGHTH–B–2(a) of the Will. (Living expense was judicially determined by the Probate Court of Sedgwick County, Kansas, to be $1200.00 per month.)

5. As to decedent's grandson, John Thomas Courtney, viewing the situation at date of testator's death, there exists a probability of invasion of the corpus of Trust "B" during his life expectancy of a yearly amount based on his customary standard-of-living as determinable, less known assets which will be offset.

6. As to the devisees Hugh Edgerton and Jeff Lyle, there is no evidence to determine likelihood of invasion, and such determination would have to be made upon the basis of extrinsic evidence at the time of testator's death concerning the financial and personal situation of each devisee. If no likelihood of invasion exists, no deduction from the charitable bequest need be made. On the other hand, if probability of invasion exists, IRS, as the administrative agency, would determine the amount of invasion during the life expectancy of each such beneficiary based on his customary standard-of-living as determinable, less the offset value of the vested remainder interest of each in the specifically devised real estate in Paragraph EIGHTH–B–4(a).

OPINION OF THE COURT

The Government raises for the first time in its brief the question of plaintiffs' standing to bring this refund action, contending that the plaintiffs' claims in this suit are at variance with those presented to Internal Revenue in their claim for refund filed prior to this suit, and as a prerequisite for the filing of such suit. The Court has examined the claim for refund, the Internal Revenue Service's written denial of it, and recalls that no issue was made of such a variance at the time of trial.

It is the Court's opinion that this contention of the Government is nonsensical, an afterthought, and is well-refuted by the facts. It is clearly apparent that both the taxpayers and the Government, both at the administrative level and in this court, have well understood the contentions of each other and the legal issues extant therein. No one has been misled. It ill behooves the Government's attorneys to raise such a fragile facade to a hearing on the merits of what actually was a most serious and close legal question. The Court believes the officials of Internal Revenue acted quite properly in the interest of the Government in making its administrative determination for the Government, since as the Court later finds, there here existed a factual situation based on the wording of the Will and the size of the Palmer Estate which was somewhere between the two leading United States Supreme Court cases and the two leading Tenth Circuit cases governing the law in this particular area of federal estate taxation. The Government's counsel, likewise, have astutely presented their legal authorities and contentions, both in open court and in their briefs, except the question just addressed. The Court will proceed to dispose of this case on the merits.

After being before the Court for some time, this case has now boiled down to or been reduced to one issue remaining, viz., whether under the terms of the decedent's Will, such Will creates a charitable remainder interest which has an ascertainable value at the date of the decedent's death under the federal estate tax law and regulations.

This issue is basically one of interpretation of the terms of the Will. The fundamental rule of will construction is that the intent of the testator must govern, such intent is to be garnered from the four corners of the instrument, and in determining intent, the key words of the will must be interpreted in the light of their context. A frequently used testator device in a will is to provide for the setting up of a specific trust fund, i. e., a fund consisting of certain ascertainable property capable of evaluation at date of death. Such trust fund is often given to A, or A and B, or to A, B, C, etc. to pay to such beneficiary or beneficiaries their living expenses during their lifetime or lifetimes, with remainder of the balance of the fund to X charity. No real problem exists where the bequest for living expense is payable from income of the fund or corpus only, without power of the trustees or a beneficiary to invade the corpus for the payment of any bequest since the corpus remains intact and has ascertainable value of its assets.

The problem both as to the charitable remainder beneficiary and the Government for purposes of estate taxation arises only when the beneficiary, single or plural, or the trustees on behalf of such beneficiary or beneficiaries, have a power to invade the corpus. Neither the named charitable beneficiary or the Government can be certain that there will be anything of value left in the estate to pass on or be transmitted to the charitable beneficiary after the death of the life legatee.

Over the years, federal case law has developed which sets certain standards or criteria for determining or judging whether there is or reasonably can be expected to be, an ascertainable amount of corpus left to the charitable beneficiary so as to be exempt from federal taxation.

The bellweather cases setting up a broad rule of law in determining taxation of such gifts by will are two United States Supreme Court cases, viz., *Ithaca Trust Co. v. United States*, 279 U.S. 151, 49 S.Ct. 291, 73 L.Ed. 647 (1929); and *Merchants National Bank of Boston v. Comm. of Internal Revenue*, 320 U.S. 256, 64 S.Ct. 108, 88 L.Ed. 35 (1943). As stated, these two Supreme Court cases have established what have become traditional rules of thumb in applying Section 2055 (26 U.S.C. § 2055) and its regulations to specific instruments. In the Tenth Circuit, whose decisions likewise have *stare decisis* effect, the Court must consider the import of *United States v. Powell*, 307 F.2d 821 (1962); and *United States v. Commercial National Bank of Kansas City*, 404 F.2d 927 (1968).

In *Ithaca*, the trust allowed the widow life beneficiary to withdraw from the principal any amount "that may be necessary to suitably maintain her in as much comfort as she now enjoys." Justice Holmes, in allowing a charitable deduction, remarked that "the standard was fixed in fact and capable of being stated in definite terms of money. It was not left to the widow's discretion. The income of the estate at the death of the testator . . . was more than sufficient to maintain the widow as required. There was no uncertainty appreciably greater than the general uncertainty that attends human affairs."

The same *Ithaca* case is also noteworthy for reemphasizing the principle that in determining the amount of the charitable remainder, the amount of the standard-of-living expense must be computed on the basis of the beneficiary's life expectancy *at the time of testator's death*, and not on an after-known factual basis occurring subsequent to the donor's date of death. In *Ithaca*, the widow, as life tenant died within a year after her husband's death and before any estate tax had been computed, and a contention was made and rejected that since it was absolutely known how much of the corpus she used or could have used, then that should be the basis for determining the remainder for charitable use for estate tax purposes.

The second Supreme Court case, *Merchants National Bank of Boston v. Comm. of Internal Revenue*, supra, involved a trust in which the grantor authorized the trustee to invade corpus "for the comfort, support, maintenance, and/or happiness" of his wife. The grantor stated further that "it is my wish . . . that . . . my said Trustee shall exercise its discretion with liberality to my said wife, and consider her welfare, comfort and happiness prior to claims of residuary beneficiaries under this trust." The Court denied the charitable deduction, stating that "the extent to which the principal might be used was not restricted by a fixed standard based on the widow's prior way of life." In this case, her "happiness" was among the factors to be considered by the trustee. The Court was willing to assume the unlikelihood of invasion. Nevertheless, Congress has required a more reliable measure of possible expenditures and present value than is now available for computing what the charity will receive. The salient fact is that the purposes for which the widow could, and might wish to have the funds spent, do not lend themselves to reliable prediction. This is not a "standard fixed in fact and capable of being stated in definite terms of money." Introducing the element of the widow's happiness and instructing the trustee to exercise its discretion with liberality to make her wishes prior to the claims of residuary beneficiaries brought into the calculation elements of speculation too large to be overcome, notwithstanding the widow's previous mode of life was modest and her own resources substantial.

In the first authoritative Tenth Circuit case of *United States v. Powell*, supra, the trustee was authorized to invade principal "for the maintenance, welfare, comfort or happiness" of the

beneficiaries and was admonished that, before principal was invaded, he should "deem that the purpose for which the payments are to be made, justifies the reduction in the principal . . .."

The Court found "happiness" to have the same meaning as "welfare" and "comfort," which are commonly construed to impose the standard-of-living test. *Merchants Bank* was distinguished on the ground that there the trustee had been given a broader power of invasion, and the Tenth Circuit stated therein:

> "It is clear, we think, that the court accorded such broader connotation to the word 'happiness,' because of the context in which it was found and, particularly, the instructions to the trustee to exercise its discretion with liberality to the wife and to consider her welfare, comfort and happiness prior to the claims of the residuary beneficiaries."

The instrument in *Powell*, on the contrary, "indicated that the power should be exercised with restraint and only when the purpose justified a reduction of the corpus . . .," an interpretation fitting the context of that instrument.

This brings this Court to consideration of the very authoritative and illustrative case of *United States v. Commercial National Bank of Kansas City*, supra, the Tenth Circuit's second and last pronouncement on the law in this area of federal estate taxation. Here, Senior Judge Jones reviewed very thoroughly the Supreme Court cases of *Ithaca* and *Merchants National Bank*, and the previous Tenth Circuit case of *United States v. Powell*, distinguished all of these cases and others, and laid down certain guiding principles of will interpretation in this category of federal estate taxation cases.

In *Commerical National Bank*, the testator created a trust in which he gave the income to his wife and a sister of testator for their life or lives, and upon the death of the last income beneficiary, the trust estate was to be terminated and the principal distributed evenly among two charitable organizations and four of decedent's nephews. The trust empowered the trustee to invade the principal for the benefit of decedent's wife. The trustee was given sole discretion to use the principal of the trust estate to pay to decedent's wife "for her comfort, welfare, contentment and happiness . . . in order that she may continue to live in the manner in which she has been accustomed to live." Then the will admonished the trustee concerning such payments of principal to the survivor wife:

> "Her enjoyment of the benefits of the Trust Estate shall be considered as paramount to the conserving of assets of said Trust Estate for the benefit of the distributees hereinafter named in paragraph 9 of this Trust Agreement (being the two charities and the four nephews)."

In *Commercial National Bank*, the Tenth Circuit panel summarized the same statutory law as is applicable in the instant case, as follows:

> "Int.Rev.Code of 1954, § 2055(a)(2) allows a deduction from a decedent's gross estate in the amount of transfers to charitable organizations. Treas.Reg. § 20.2055–2(a) covers situations where the charitable transfer consists of a remainder interest with the intervening life estate belonging to a noncharitable beneficiary. This regulation states that a 'deduction may be taken of the value of the charitable beneficial interest only insofar as that interest is presently ascertainable, and hence severable from the noncharitable interest. . . . Thus, if money or property is placed in trust to pay the income to an individual during his life . . . and then to pay the principal to a charitable organization, the present value of the remainder is deductible.' Where a trustee has a power to divert the principal to a noncharitable use, 'the deduction will be limited to that portion, if any, of the property or fund which

is exempt from an exercise of the power.' "

From Judge Jones, speaking for the Tenth Circuit in that case and other federal cases, one can summarize the criteria of judicial judgment distilled from the federal court cases of the Supreme Court and various circuits, as follows:

First, for a charitable remainder subject to invasion to be deductible, it must first be established that the instrument contains an ascertainable standard of invasion by a life beneficiary, i. e., one which is capable of being stated in definite terms of money.

Second, in all cases allowing the deduction, this ascertainable standard has been the standard-of-living criterion, either expressly stated or implied from the language of the instrument. If no such standard exists, the charitable deduction is denied, no matter how remote the possibility of invasion might be. If the instrument contains such a standard, then the Court will later have to determine the likelihood of invasion.

Third, the time of measurement or ascertainment of the standard of invasion, as well as the later determination of the likelihood of invasion if necessary, is at or as of the date of the testator's death, and not by after-occurring known facts.

Fourth, in determining whether an ascertainable standard of invasion exists, the language of the instrument under scrutiny must be interpreted in conformity with state law, citing *Blodget v. Delaney*, 201 F.2d 589 (1st Cir. 1953).

Fifth, where an instrument contains a standard-of-living clause in one place in the instrument that seems to meet the requirements of definiteness and at a later place language that seems to enlarge or open the doors of largess —that is, it contains both a narrow and a broad standard of invasion, then the instrument must be treated as permitting invasion to the extent of the broader standard. Stated differently, the broad or indefinite standard establishes the outer limit of invasion, not the narrow or definite one. See *Union Trust Co. v. Tomlinson*, 355 F.2d 40 (5th Cir. 1966); and *State Street Bank & Trust Co. v. United States*, 313 F.2d 29 (1st Cir. 1963).

Sixth, and finally, if it is determined by the Court, as interpreter, that an ascertainable standard of invasion of the corpus does exist, then the Court will determine the likelihood of invasion. If invasion is likely, the estate whose federal estate tax liability is before the Court, would have to be sent back to Internal Revenue, as the administrative arm of Government, for a determination of the taxable and nontaxable portions of the bequest, unless such a conclusion is clear in the evidence before the Court. On the other hand, if a determination is made that invasion of the corpus is unlikely, then presumably it would go back to Internal Revenue for allowance of the entire unusable principal as a legitimate charitable deduction, unless the evidence before the Court supplies the correct answer.

Having reviewed the law of this decision, and the basic criteria for judgment of the Court, the Court now turns to analysis of the Palmer Will to determine the basic tenet of will construction, viz., the intent of the testator.

There is no legal or taxable question extant in the first seven paragraphs of the Palmer Will which provide for specific legacies. Paragraph EIGHTH deals with the residue of the estate and directs that one-half of the residue be set up as Trust "A", in which the net income thereof is bequeathed to testator's wife, Daisye Palmer, along with the power in the wife, exercisable either during her lifetime or by her will, to dispose of the entire corpus of Trust "A". If she failed to use the corpus or dispose of it by will, provision was made for that property to go to and fall into Trust "B". The widow has since exer-

cised her power of disposal of the assets in Trust "A".

Trust "B" was created by paragraph EIGHTH with the remaining one-half of the residue of testator's property. It is with Trust "B" that the remaining issue in this law suit arises. See Finding of Fact No. 3 for exact context. To summarize, however, Part B–2 gave the net income of the trust as follows: $600.00 per month to testator's daughter, Eileen Palmer Courtney, now Hipps, during her lifetime; the remainder of such income to testator's wife Daisye during her lifetime. Part B–3, because it is the crucial clause, is quoted as follows:

> "3. I direct that my Trustees shall pay to or expend for the use or benefit of my grandson, John Thomas Courtney, all necessary funds to pay any medical and hospital expenses by him incurred, and to provide for the care, comfort, maintenance, support and general welfare of my said grandson during his life time, and at the time of his death provide adequate funeral and burial services. While it is my desire that the Trustees liberally provide for my grandson, said Trustees shall, in their sole discretion, determine and conclude, from time to time, the extent and amount of care, support and maintenance expenditures from said trust estate."

Part B–4 provides that after the deaths of testator's wife Daisye, his daughter, Eileen Palmer Courtney (Hipps), and his grandson, John Thomas Courtney, the remainder of Trust "B" should be disposed of as follows:

(a) Certain described real estate is specifically devised to Hugh S. Edgerton and to Jeff C. Lyle;

(b) The remainder of said trust funds to be paid and distributed to a charitable and educational corporate foundation, designated as "The Ella Palmer Foundation."

The precise legal issue of this law suit is the calculable amount of assets, if any, which this charitable foundation will receive.

Paragraph NINTH of the Will deals with various powers of the trustees of the two Trusts "A" and "B", giving them virtually a free hand in the management, control and sale of assets with certain specific exceptions not germane to this law suit. Again, however, Paragraph NINTH (d) is of such significance to the interpretation here made that it is set forth verbatim:

> "(d) I hereby authorize my said Trustees, irrespective of the provisions for the distribution of my said trust estates, to at any and all times pay from either the income or corpus of these trust estates to any of the beneficiaries hereinabove named or designated, such sum or sums of money as in the opinion and sole discretion of said Trustees shall be deemed necessary, advisable and requisite for their maintenance, support, care and health. Should any payment be made under this provision to any such person, the same shall be charged as an advancement to the share of such person in such trust estates, if such person's interest therein is that of an ultimate beneficiary."

No other provisions of the Palmer Will are material for the purposes of this decision.

The Court first examines and refers to the provision of Paragraph NINTH (d) quoted above. Indisputably, it refers only to the property or assets covered by the Trusts "A" and "B" set up in paragraph EIGHTH. Indisputably, likewise, it covers only beneficiaries mentioned there, viz., the testator's wife Daisye, his daughter Eileen, his grandson John Thomas Courtney, and the specific devisees, Edgerton and Lyle. By its provisions, NINTH (d) allows the payment to these beneficiaries by the

trustees from corpus "such sum or sums of money as in the opinion and sole discretion of the trustees shall be deemed necessary, advisable and requisite for their maintenance, support, care and health." This particular language is the standard verbiage approved in *Ithaca* and its progency, and obviously provides a calculable standard should there be likelihood of distribution. For the purposes of this decision, it can be said it provides nothing additional for either the wife Daisye or the grandson John Thomas Courtney, the likelihood being nil that Daisye would require any more, and the fact that Courtney was previously given the same grant, with more liberal terms, in Paragraph EIGHTH B–3. As to the daughter Eileen, it enlarges her EIGHTH B–2(a) bequest into a standard-of-living bequest clearly calculable under *Ithaca*. Relative to Edgerton and Lyle, it may be an enlargement of the specific devise to them in EIGHTH B–4(a) to a standard-of-living bequest, again calculable under *Ithaca*, but extremely unlikely of realization because NINTH (d) provides any payments for living expense shall be considered an advancement or charge against the value of their ultimate vested remainder interest in the described real estate, obviously a very valuable estate asset whose one-half value as to each Edgerton and Lyle would have to be exceeded before any invasion of corpus could occur.

This brings the Court to consideration of the bequest to the grandson John Thomas Courtney in EIGHTH B–3, which has been the real center of controversy in this case. The Court has determined that the overall intent of this paragraph was to provide only a standard-of-living bequest to Courtney. Of course, all necessary funds for medical and hospital expense normally would fall within and be encompassed by a care-comfort-maintenance grant. The key words of the bequest to Courtney are to provide for the "care, comfort, maintenance, support and general welfare of my said grandson during his lifetime." The only words there which might suggest enlargement over standard-of-living are "comfort" and "general welfare." The Government would have the Court equate these with the frowned-on word "happiness." I do not do so. To the Court, "comfort" and "general welfare" are consistent with standard-of-living and were intended by the testator to be synonymous with and equivalent to "care," "maintenance," and "support."

Again, the Government contends the words "liberally provide for my grandson" constitutes an enlargement of the calculable standard-of-living measurement, and hence poisonous to the plaintiff's tax contentions. Again, the Court disagrees. The words following that phrase indicate an intention of the testator to rely on the sole judgment of the trustees as to the amount of care, support and maintenance expenditures. Neither does the Palmer Will as to Courtney or any other individual trust beneficiary indicate that decedent Palmer was more interested in the expenditures being made generously by the trustees for such beneficiaries than in conserving the estate for the charitable purposes provided in EIGHTH B–4(b).

It should be noted that in virtually all of the federal cases cited in the Government's brief and those which have come to the attention of this Court where the standard of invasion has been held to be nebulous, speculative or incalculable, all contained verbiage *more than* is in this Will, which indicated the testator's clear intent to enlarge on the standard-of-living norm sanctioned by *Ithaca*. Certainly, such elastic language was apparent in *Merchants National Bank* (combination of expressions of "happiness," "liberally," and "her . . . happiness prior to claims" of charitable beneficiaries); and in *Commercial National Bank* (combination of "happiness of wife," and admonition that her enjoyment of benefits be considered "paramount" to that of charitable beneficiaries).

One of the Government's arguments in its brief designed to show the incalculable amount of living expense which the grandson Courtney might require, is that Courtney was only eighteen years of age at date of death of decedent, and had been injured severely. The claim is that a permanent fixed lifestyle had not yet been established and that because of some serious or permanent injury the expense requirement would be more—and hence speculative. Both arguments are highly specious in the Court's opinion and inject two factors which no court has as yet required, i. e., that a donee must reach a certain age to attain a life style, and that he must be physically and mentally healthy and without bodily handicap. Not so. If standard-of-living as laid down by *Ithaca* is a norm, it must be applied equally through statistical formula to young, middle-aged and old alike, as well as to the healthy and sound vis-a-vis the unhealthy and handicapped. If the law is to apply equally, standard-of-living can be as calculable for the infant as the octogenarian through abundant data available from private and governmental sources on cost-of-living for income groups. Few wills, if any, contain lifestyle data on the beneficiaries. Usually only their name, relation and admonition as to maintaining them in their customary standard-of-living fashion is set forth. The data on a donee's customary standard-of-living must always be ascertained and is ascertainable from facts outside the will. However, extrinsic facts, such as the financial circumstances of a life beneficiary, though relevant to the remoteness of invasion, are irrelevant to whether the charitable interest is presently ascertainable. See *Seubert v. Shaughnessy*, 233 F.2d 134 (2nd Cir. 1956).

One other contention is made by the Government in its post-trial brief which needs comment by the Court. It is argued by the Government that the broad powers given to the trustees in paragraph NINTH of the Will to sell, convey, dispose . . . invest and reinvest the assets of the trust, much of which was oil and gas properties, and the added power to pay estate expenses from either income or principal make it speculative what assets might eventually remain in Trust "B". Without going into detail, suffice it to say this is an untenable argument. The purpose of the provisions was to give the competent trustees full and flexible power to manage the assets to enlarge and not diminish the estate. This is emphasized in the last sentence of paragraph NINTH (a), where it is stated:

> "In making investments or reinvestments other than otherwise herein provided, said Trustees shall buy only such property as may be within the standards for investments by fiduciaries in the State of Kansas, as in the exercise of the Trustees' sound judgment shall be proper investment for trust funds."

Paragraph NINTH (6) went on to restrict the trustees' power of sale or disposal of certain specifically named property in the estate.

Furthermore, as pointed out in *Powell*, under Kansas law, a court of equity has power to review exercise of discretionary powers conferred on trustees, and to correct any abuse in exercise of such discretion. It is to be further noted that in *Powell*, the Tenth Circuit held broad powers of investment and control of trust assets as not giving trustees power to alter or amend the corpus within the prohibited provisions of the Internal Revenue Code.

Having first determined that the standards provided by this Will are sufficiently fixed, objective and measurable under the language of the testator, it is required that the Court make a determination as to the likelihood of invasion. The Court has no problem, of course, with the wife, Daisye Palmer, knowing she has the property of Trust "A", both as to principal and income as well as a

substantial amount of the income from the properties constituting Trust "B". As to the remaining beneficiaries, the daughter Eileen Courtney Hipps, the grandson John Thomas Courtney, and the two specific devisees, Edgerton and Lyle, there is no evidence before the Court upon which a valid determination may be made as to the probable amount of invasion of the corpus of Trust "B" during each of their respective lifetimes. Therefore, it becomes necessary that this aspect of the case be remanded to Internal Revenue Service for an administrative determination to be made of the amount of necessary corpus for the care, support, and maintenance of Eileen Courtney Hipps during her life expectancy, and of the grandson John Thomas Courtney during his life expectancy.

In determining the amount the daughter Eileen Courtney Hipps might reasonably take from the corpus of Trust "B", the amount of her $600.00 monthly legacy from the income of Trust "B" would have to be taken into consideration, as well as the first Probate Court determination of standard-of-living as set forth in Conclusion of Law No. 4.

As to administrative determination of the probable deletion of corpus for John Thomas Courtney during his life expectancy, it would appear logical to require exhaustion of his known resources of $125,000.00, as found in Finding of Fact No. 9, by subtracting that amount from a total life expectancy sum. Unfortunately, and contrary to the belief and assertion of the plaintiffs in their briefs, Internal Revenue must make this on lifestyle or standard-of-living evidence as to both of them which was available at testator's date of death. It certainly appears at this time—nine years after decedent's death—in the light of transpiring events including the now-known renunciation by stipulation of the widow dated March 9, 1972, that the income of Trust "B" would easily take care of the living needs of both Eileen Courtney Hipps and John Thomas Courtney. However, this disclaimer by the widow, occurring as it did after the date prescribed for filing the Palmer Estate tax return, may not be taken into consideration by the Internal Revenue Service or a court in making computations of probable deletion from corpus by Hipps and Courtney.

Furthermore, while it is possible that had evidence been introduced before this Court relative to the financial circumstances of both Edgerton and Lyle, this Court could have found no likelihood of invasion of the corpus of Trust "B" on either of their behalfs, no such evidence was proffered. Hence, it will now be incumbent for either Internal Revenue Service to hear such evidence in this regard, or for this Court to reopen the evidentiary phase of this case to do so. For the purposes of terminating this litigation, the Court chooses to now refer this matter to the Internal Revenue Service for determination. Some loose language in plaintiffs' brief would indicate that the value of the devise to Edgerton and Lyle was worth $300,000.00. However, a copy of a State Inheritance Tax Return before the Court *ex judicio* indicates the total appraised value of the described real estate devised to be $315,000.00, while the value of the vested remainder interest of each Edgerton and Lyle after the deaths of the three life tenants, was appraised at approximately $31,000.00 each. Such sum is not inordinately large so as to provide instant and perpetual wealth in itself. Therefore, it would appear there is a possibility of invasion of the corpus by Edgerton or Lyle, or both, unless the financial circumstances of each is such as would likely preclude any intrusion into the corpus of Trust "B" over and above the value of the remainder interest of each which is to be offset against any advances from corpus. Here, again, if the financial situation of either Edgerton or Lyle was precarious at testator's death as to indicate probability of aid and succor, then Internal Revenue Serv-

ice would necessarily be required to compute the amount of invasion for standard-of-living during life expectancy.

In sum, then, the Court believes that some of the contentions on both sides have been erroneous. The estate may not have its charitable deduction, as claimed, by viewing events in the light of facts occurring after death of the testator. The Government may not impose its estate taxes on its version of the facts or the law. Even though under circumstances now known, it would appear the whole corpus may very well, in fact, go to the charitable foundation, the Government, on behalf of the people of the United States, may exact a tax based on facts known at the date of death.

It is therefore ordered that judgment be hereby entered for the plaintiffs and against the defendant on the remaining legal issue, i. e., holding that the Will of Tom Palmer does create a charitable remainder interest which has an ascertainable value at the date of decedent's death under the federal estate tax law and regulations.

It is further ordered that the federal estate tax assessment or computation due from the Tom Palmer Estate, be remanded back to the Internal Revenue Service of the United States, Department of the Treasury, for final determination of federal estate tax due in accordance with the Court's Findings of Fact and Conclusions of Law, and views set forth in the Opinion of the Court.

It is further ordered that after either the Internal Revenue Service has made its tax computation as directed, or that the parties have agreed upon the amount of such final tax liability, then the parties shall submit a final journal entry of judgment to the Court for consideration and approval, if such computation is not claimed to have been arbitrarily or capriciously made, and for final resolution of this litigation. All costs accruing herein shall be taxed against the defendant.